**UNITED STATES of America,
Plaintiff,**

v.

**Anthony CAPANELLI, Defendant.**

**No. 01 CR 1121(CSH).**

United States District Court,
S.D. New York.

May 12, 2003.

James B. Comey, U.S. Atty., New York City, Matthew L. Biben, Edward C. O'Callaghan, of Counsel, Edward W. Paynes, P.C., New York City, for Plaintiff.

Edward W. Hayes, Rae Koshetz, of Coundel, for Defendant.

## ORDER

HAIGHT, Senior District Judge.

The question presently before the Court is whether "exceptional reasons" within the meaning of the Bail Reform Act, 18 U.S.C. § 3145(c), justify the release pending sentence of defendant Anthony Capanelli. Capanelli contends that they do and moves for that relief. The government opposes the motion and argues that the statute mandates Capanelli's detention. The parties have briefed the issue. The Court heard oral argument on May 7, 2003.

## I. BACKGROUND

In a four-count indictment, the government charged defendant Anthony Capanelli with conspiracies and attempts to commit certain crimes at the printing and distribution plant (the "Plant") maintained by The New York Times ("the Times") located at College Point, Queens. Specifically, Count One charged that during the period from October 2000 to May 2001, Capanelli conspired with others to rob the Times of payroll money, in violation of 18

U.S.C. § 1951(b)(1). Count Two charged that Capanelli and others attempted that robbery. Count Three charged that during the same period, Capanelli conspired with others to take money "from the person and presence of another" by "force and violence, and by intimidation," in violation of 18 U.S.C. § 2113(a), the money in question being in the care and custody of The Times Employee Federal Credit Union located at the Plant. Count Four charged that Capanelli and others attempted to commit that offense.

Following trial the jury acquitted Capanelli on Counts One, Two, and Four, but convicted him on Count Three. Capanelli had been free on bail, but in view of his conviction, the government moved that he be detained pending sentence, relying principally upon the provisions of the Bail Reform Act found in 18 U.S.C. §§ 3143(a)(2), 3142(f)(1)(A), and 3156(a)(4)(A). At the conclusion of an extended colloquy with counsel concerning these statutory provisions, I granted the government's application and ordered Capanelli detained.

During that colloquy neither counsel nor Court referred to § 3145(c). Because the Court's post-trial research indicated the possible applicability of that subsection to Capanelli's situation, I entered orders dated April 23, 2003 and May 1, 2003, directing counsel to brief and argue the question, and to include in their submissions discussions of *United States v. DiSomma*, 951 F.2d 494 (2d Cir.1991), and *United States v. Chen*, No. 02 Cr. 1039, 2003 WL 1701986 (S.D.N.Y. March 28, 2003).

## II. DISCUSSION

### A. The Statutory Scheme

The jury's conviction of Capanelli on Count Three triggered § 3143(a) of the Bail Reform Act, captioned "Release or detention pending sentence," which provides in pertinent part:

> (2) The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained unless–
>
> (A)(i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted;
> · · ·

Subparagraph (A) of 3142(f)(1), incorporated by reference in § 3143(a)(2), describes in generic terms "a crime of violence," a phrase § 3156(a)(4) defines in pertinent part as

> (A) an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another.[1]

Following his conviction on Count Three, I applied these provisions in detaining Capanelli because I concluded that the crime of conviction was "a crime of violence" within the statutory scheme, and I was unable to perceive a "substantial likelihood that a motion for acquittal or new trial will be granted." However, as noted *supra*, no reference was made during the post-conviction colloquy to § 3145(c), which, while captioned *"Appeal* from a release or detention order" (emphasis added), goes on to provide in pertinent part:

> A person subject to detention pursuant to section 3143(a)(2) or (b)(2), and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released, under appropriate conditions, by *the judicial officer,* if it is

---

1. I have quoted § 3156(a)(4)(A) word for word. The subparagraph would be improved grammatically if it read: "an offense that has *as* an element ..."

clearly shown that there are exceptional reasons why such person's detention would not be appropriate.

(emphasis added). The emphasized language set the stage for Judge Schiendlin's decision in *Chen,* 257 F.Supp.2d 656; she there concluded that "a review of the text and structure of section 3145 compels the conclusion that a district court may not consider 'exceptional reasons' as a basis for release," *id.* at 664, an exercise entrusted by the section, in her view, solely to appellate judges. The government does not agree with Judge Schiendlin's construction of § 3145(c), for the reasons stated in its May 2, 2003 letter brief in the case at bar at 3–6; neither, with the greatest respect, do I; and several circuits (including by necessary implication the Second Circuit in *DiSomma*) have held that the term "judicial officer" encompasses in this context both district and appellate judges. Accordingly I regard myself as competent to answer the question that I raised *mea sponte.*

■ In *DiSomma,* 951 F.2d at 496, the Second Circuit described the protocol that a trial judge should follow in applying the provisions of § 3145(c) to a particular case:

While the language of section 3143(b)(2) compels detention, an exception permits release of mandatory detainees who meet the requirements for release under section 3143(b)(1), and "if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." 18 U.S.C. § 3145(c). Thus, section 3143(b)(1) supplies the threshold requirements that a person convicted of a violent crime must meet. To satisfy those requirements, the trial judge must find that the person poses no risk of flight and no danger to the community during release and that the appeal "raises a substantial question of law or fact likely to result in" reversal, a new trial, or a reduced sentence, and is not interposed for purposes of delay. 18 U.S.C. § 3143(b)(1). Only then does the trial court consider the presence of exceptional circumstances making detention inappropriate.[2]

### B. Application of that Statutory Scheme to this Case

■ Under the *DiSomma* protocol, a trial judge considers the existence *vel non* of "exceptional reasons" under § 3145(c) only if the judge first finds in defendant's favor on three threshold issues: that the person (1) poses no risk of flight or (2) danger to the community, and (3) his appeal would raise "a substantial question of law or fact likely to result" in reversal, a new trial, or a reduced sentence.

In the case at bar, the government does not argue that Capanelli poses a present danger to the community. But it does contend that, given the length of the Guidelines-oriented sentence, Capanelli poses a flight risk (notwithstanding the presence of four minor children in Suffolk County), and that in any event Capanelli cannot point to any question of law or fact likely to result in an alteration of the trial result. The case really turns on the third of these questions. I will assume without deciding that Capanelli poses no danger to the community and no risk of flight as well. Nonetheless, his application for release from detention under § 3145(c) fails unless Capanelli can demonstrate that the trial record generated a sufficiently substantial question of law or fact.

**2.** The careful reader will have noticed that the *DiSomma* protocol describes the procedure triggered by § 3143(b), which governs release or detention pending appeal, while the case at bar is governed by § 3143(a), dealing with release or detention pending sentence. But for there is no principled difference for purposes of the analysis given in text.

The particular circumstances of this case blend the § 3143(a)(2)(A)(i) requirement of a "substantial likelihood that a motion for acquittal or new trial will be granted" together with the § 3145(c) requirement that "exceptional reasons" exist to justify release. In that regard, this case resembles *DiSomma.* Capanelli principally relies upon *DiSomma,* and it is easy enough to see why he does so: DiSomma, like Capanelli, was convicted on one count of conspiring to commit a crime of violence.[3] Invoking § 3145(c), the trial judge (Cedarbaum, *J.*) released DiSomma pending sentence and appeal. *United States v. DiSomma,* 769 F.Supp. 575 (S.D.N.Y.1991). Judge Cedarbaum noted that DiSomma's appeal "will raise a substantial question likely to result in reversal," namely, "that a reasonable juror could not conclude beyond a reasonable doubt that DiSomma conspired to commit robbery, as distinguished from burglary or larceny." *Id.* at 576. That circumstance was sufficient to implicate the "exceptional reasons" provision of § 3145(c), Judge Cedarbaum reasoned, because "the substantial issue raised by DiSomma about his conviction— the element of violence—is the very element that prevents his release under § 3143." *Id.* at 577. The government appealed. The Second Circuit affirmed Di-

Somma's release, adopting and paraphrasing the trial judge's rationale:

> We are confronted here with a most unusual factual and legal situation, one that fully justified the exercise of discretion by the district court. The statute of conviction requires proof of violence, and the existence *vel non* of that element is said to present a substantial question on appeal. It is that very violence that mandates detention under the provisions of the Bail Reform Act. The element of the crime called into question on appeal is the element of the bail statute that bars release. Because this is so, DiSomma will have been confined unjustly if he prevails on appeal. In this case, prevailing on appeal may well result in dismissal of the indictment, since failure of evidence of violence is the kind of factual insufficiency that warrants dismissal.

951 F.2d at 497–98.

Capanelli argues that *DiSomma* entitles him to release pending sentence under § 3145(c) because, like DiSomma, he also challenges the element of violence required by § 2113(a), the statute of conviction on Count Three, the same violence that mandates his detention pending sentence under the Bail Reform Act; and, like DiSomma, if that challenge succeeds, Capanelli will have been unjustly confined.

---

**3.** It is useful to note at this juncture that the object of the conspiracy the government charged and proved in *DiSomma* was a Hobbs Act robbery violative of 18 U.S.C. § 1951. In the case at bar, on the issue of whether Capanelli conspired to commit "a crime of violence" within the context of the Bail Reform Act, the government has cited a number of Second Circuit cases uniformly characterizing § 1951 robberies as crimes of violence. And, in point of fact, in Counts One and Two the government charged Capanelli with conspiring and attempting to violate § 1951; but they were not counts of conviction, they were counts of acquittal. However, this is a distinction without a difference, since

Capanelli was convicted on Count Three of conspiring to violate 18 U.S.C. § 2113(a), captioned "Bank robbery and incidental crimes." Of course, the textual body of a statute gives it meaning, not its caption; but it is an element of a § 2113(a) offense that the offender act "by force or violence, or by intimidation" in depriving a bank or credit union of money in its possession, thereby coming within the Bail Reform Act's definition of a "crime of violence" as an offense having as one of its elements "the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 3156(a)(4).

While the analogy Capanelli draws between *DiSomma* and the case at bar has a surface appeal, that analogy is effective only if the question Capanelli proposes to raise on appeal is the same as the one available to DiSomma on the facts of his case, or, if not, one of comparable substance. The nature of those questions, and the facts giving rise to them, must be further analyzed.

The facts in *DiSomma* may be gleaned from the companion case of *United States v. Skowronski*, 968 F.2d 242 (2d Cir.1992), which involved a different defendant but the same conspiracy. The government charged that the conspirators planned to rob the Telco Jewelry store in Brooklyn, a relatively modest establishment which "carried an inventory worth about $300,000; when closed, it was protected by security gates lowered over the door and display windows. From Thanksgiving through the end of the Christmas season, the store remained open until 9:00 p.m., and during evening business hours it was protected by security guards." *Id.* at 244. Defendant Skowronski, a college student, worked part-time at the store, which his mother managed; in addition to Skowronski and his mother, the store employed three women, "and the owner testified that store policy normally required that a least three employees be present at all times." *Id.* An architect of the conspiracy, one Tinnirello, referred to Skowronski as his "inside guy," *id.* at 245, a phrase evocative of the case at bar, in which Fiorello, a principal conspirator, referred to an employee at the Times Plant (Capanelli, on the government's theory of the case) as the "inside guy." The robbery of the Telco Jewelry store never took place because, unknown by the conspirators, the FBI was surveilling some of them and recording their telephone conversations.

Skowronski was convicted of conspiring to commit a robbery in violation of the Hobbs Act, 18 U.S.C. § 1951. On appeal he challenged the sufficiency of the government's evidence on the ground, *inter alia*, that "the store would have been robbed without force or the threat of force, and hence an essential element of the alleged Hobbs Act violation would have been lacking." 968 F.2d at 247. The Second Circuit rejected that argument because it considered that the trial record permitted a finding that the planned robbery "was to take place during business hours," *id.* at 248, concluding on that issue:

> In sum, the evidence was ample to permit a rational juror to infer beyond a reasonable doubt that Skowronski was a member of the conspiracy whose objective was to rob a store by force or threat of force in the presence of innocent victims. The evidence was thus sufficient to support his conviction for conspiracy to violate the Hobbs Act.

*Id.* The Second Circuit's review of the evidence makes it clear that the phrase "innocent victims" includes both customers ("Obviously during those hours, customers could easily be present in the store as well. The complicity of Skowronski thus did not mean that there would be no need for the use or threat of force against others"), *id.*, and security guards ("Finally, for the robbery to be successful in the presence of security guards, none of whom was implicated in the crime, at least a threat of force would presumably be required."), *id.*

That, then, was the potential question on appeal of sufficient substance to justify release pending sentence in *DiSomma*, which the Second Circuit decided prior to deciding *Skowronski*. See *DiSomma*, 951 F.2d at 498 ("The statute of conviction requires proof of violence, and the existence *vel non* of that element is said to

present a substantial question on appeal.").[4]

Capanelli professes to find in the trial record several substantial questions on appeal which, applying *DiSomma,* would justify his release. The first question focuses upon Capanelli's subjective awareness of what the conspirators were planning. Thus he argues that "[i]n the absence of evidence that [he] was informed that the contemplated crime was an armed robbery, the evidence against him is equally consistent with a planned burglary, which is not a 'crime of violence' as contemplated by 18 U.S.C. Section 1951(b)(1)," Letter Brief dated April 23, 2003 at 2,[5] and "defendant's conviction of conspiracy to commit robbery, in the absence of any evidence that he knew about supposed plans to commit violent acts, constitutes such an exceptional reason [under § 3145(c) of the Bail Reform Act] because it is completely against the weight of the evidence and requires reversal as a matter of law," Letter Brief dated May 6, 2003 at 2; the trial evidence, Capanelli argues, prevents "any fair fact-finder from concluding that this defendant knew that an armed robbery was contemplated," *id.* at 5. Expanding on that argument at the hearing, defense counsel said:

> [T]his young man was never overheard and there is no evidence in the record that shows that he had any knowledge of any of the particular details of whatever these other people were supposedly planning to do.

This is an element that the government had to prove in order to find Mr. Capanelli guilty of robbery, that he acted with the intent that a robbery take place. Not a larceny, not a burglary. Tr. 11.

Second, Capanelli characterizes undercover officer Smith and cooperating witness Ottomanelli as "agents provocateurs" who "actively encouraged a bunch of lazy, middle-aged burglars to upgrade their plan from a larceny to an armed robbery," so that "refusing bail to the defendant would be a serious miscarriage of justice." Letter Brief dated May 6, 2003 at 5.[6]

Third, Capanelli contends through counsel that even considering all the taped conversations of all the participants in them, they

> show that there was even a thought that perhaps a robbery wouldn't be necessary at all, that they were given some information that money was left lying around and that they could go get it.
>
> There seemed to be no consistent expression of interest in committing a robbery or in injecting violence into the various scenarios that were being discussed.

Tr. 11.

These arguments do not persuade, singly or in combination. First, whether Capanelli was aware that the object of the conspiracy was a robbery instead of a burglary is a different question from whether

---

**4.** The Second Circuit regarded that question as considerably less substantial when it came to consider its merits in *Skowronski,* but for the *DiSomma* court that resolution lay in the future.

**5.** Like the government, Capanelli crafts his argument as if the crime of conviction was a conspiracy to violate § 1951, instead of § 2113(a), but the difference is not material. *See* n. 3, *supra.*

**6.** An agent provocateur is "one employed to associate himself with members of a group or with suspected persons and by pretended sympathy with their aims or attitudes to incite them to some action that will make them liable to apprehension and punishment." Webster's New Collegiate Dictionary (1976) at p. 22. The concept is evocative of that of entrapment in criminal law.

the object was in fact a robbery, the question presented by *DiSomma*. The cases would be analogous only if Capanelli's specific knowledge of what the other conspirators were saying to each other was an essential element as to him, but that is inconsistent with the familiar concept of conspiracy as a partnership in crime, where each conspirator is responsible for the words and acts of the others, and Capanelli was convicted of conspiracy.[7] Second, while Smith and Ottomanelli to some degree played the roles of agents provocateurs, intending that their recorded conversations with the conspirators fully reveal those individuals' willing participation in a criminal scheme, the evidence clearly shows that the individuals themselves (Nicholas Fiorello, the principal architect of the scheme, Carmine Russo and Elio Albanese, the seasoned Genovese family members recruited to wield any required firearms, and that *eminence grise*, the disgraced former police officer, Joe Savarese) needed no encouragement in their contemplation of and planning for the use of violence to make a financial score at the Plant. Third, there is a quantum difference between *DiSomma*'s small jewelry store, open during daytime hours but locked and uninhabited at night, and the Times Plant at College Point, a 24/7 beehive of activity, never unoccupied, with day and night shifts of pressmen, drivers, and assorted supporting troops (including, significantly enough, 24 hour a day security guards) constantly coming and going. In those circumstances, the substantial question on appeal the Second Circuit dis-

cerned in *DiSomma* as a justification for release pending sentence cannot arise in the case at bar as a matter of law. The Plant was swarming at all times with "innocent victims," to use the court of appeals' phrase in *Skowronski*, 968 F.2d at 248. That circumstance is quite enough to demonstrate that at least the threat of violence was inherent in the scheme, which is in turn sufficient to characterize the intended crime as one of violence within the governing statutes. Moreover, that is a circumstance of which Capanelli had specific knowledge, since he worked at the Plant (thereby qualifying to be the "inside guy"). Capanelli's specific knowledge extends to the presence of security guards, a factor which the Second Circuit stressed in *Skowronski*, saying that "for the robbery to be successful in the presence of security guards, none of whom was implicated in the crime, at least a threat of force would be required." *Id.* In the case at bar, the jury could and quite clearly did find that Capanelli was the "inside guy" who drew the map Fiorello gave to the other conspirators; and that map prominently displays the presence and location of the "security" forces.

For the foregoing reasons, and because I cannot discern in this record a substantial question of law or fact likely to result in a reversal or a new trial, Capanelli's motion for release pursuant to § 3145(c) of the Bail Reform Act must be denied for failure of a condition precedent to that relief.

---

7. I recognize that this concept should not be pressed too far. If, for example, evidence of recorded conversations between conspirators in which a particular defendant did not participate demonstrated that the only objective of the conspiracy was to hijack a plane, and the defendant, ignorant of that objective, thought that the scheme was to hold up the corner drug store, *quaere* whether that defen-

dant could be convicted of the conspiracy charged in the indictment or revealed by the proof. In the case at bar, however, the essential and sole objective of the conspiracy was to obtain illicit possession of funds in the custody of the Times credit union; that objective was known to all the conspirators, which included, according to the jury's legally permissible finding, Anthony Capanelli.

The defendant's motion to be released pending sentencing and appeal is denied.

It is SO ORDERED.